We're now dealing with Leslie Perdomo v. Holder. Yes. Please, the court. We now have a decision from the Board of Immigration Appeals that we can look at because they considered the question of whether all of the women in Guatemala are members of a particular social group. And I think they messed it up very, very badly. Going back to the controlling case, the matter of Acosta, it says sex, color, and kinship. Those are the three. Now, we're talking about sex. We're not talking about sexual orientation, which we apply for homosexuals in certain groups. We're talking about sex. We're talking about men and women. And if we're in the context of asylum cases, Your Honor, we're talking about a specific country where these people are applying for asylum. So that means, you know, half the population are men, half the population are women. So when the board says, well, this group is too broad, that doesn't solve the question. They're looking at the view that the Ninth Circuit holds that there are certain voluntary associations that qualify as particular social groups and that these must be very narrowly defined. And I agree with that. But this is not a voluntary group. This is an innate characteristic. So I think it just stands that, yes, as a proposition, under Acosta, where it says sex is one of the innate characteristics, all the women of Guatemala are a particular social group. But the question is – But counsel, what – excuse me if you're interrupting, but we have a Ninth Circuit case admittedly from 1986, Sanchez-Frio, that speaks about groups that are too large. This might qualify. What do you do with that case? We have recent cases that were cited in the briefs from the BIA indicating that you can have broader groups or a whole group of women in a country. But the one case on our books is Sanchez-Frio. What is your response? Well, I'm not familiar with that case, Your Honor, but the case I do rely on is Singh v. INS, which was decided just a few years ago, involving the question of the Indo-Fijians in Fiji, where we know the population in Fiji is approximately 50% Indians who came in as a detention service and the native Fijians. And in that particular case, Judge Brakelson said, you know, even though it's half the population of Fiji, it is not too broad. The question is, are they suffering discrimination, harassment and persecution? And he ruled that they did. Now, at the present time, we have a Fijian army general has taken over the presidency of Fiji because the Indians managed to elect one of their own. And the United States is not being flooded with Indo-Fijians seeking asylum in the United States. I think it's a logical conclusion that you can have half the members of the country part of a group. In support of your argument, I will say we have case law holding that it is persecution within the meaning of the statute for female genital mutilation. And of course, the group subject to female genital mutilation is the group of females. But in order to get relief under our case law, the particular individual has to show that she personally is at some risk of this happening to her. So even if we concede or agree with you that women as an entire group can be a social group for purposes of the statute, which I think they can be, it nonetheless remains an obligation to show that your particular client is at risk for what we're calling for the time being, femicide. Well, I disagree with that, Your Honor, because I'm looking at a Ninth Circuit case, Sanchez-Trujillo v. INS, and you laid out four criteria for establishing the social group presentation. Is the group recognizable? Yes, the women are recognizable as a group. Does the alien qualify as a member of the group? Yes, they're women. Is the group being targeted because of characteristics as a group? Yes, femicides are only committed against women. You know, and sexually motivated. And here's the most important point made in Sanchez. Are special circumstances present which permit per se findings and which do not require findings of individual persecution of members of the group? And I think that answers your question, that if there is persecution of the group as a whole and they're members of the group, they do not have to have any specific per se evidence that they are going to be persecuted. You see, I'm not sure that that's right. Or I'll say it more strongly, I think that that's wrong. For example, it may very well be that within China, practitioners of Falun Gong are persecuted. The evidence is actually fairly strong that this is so. But that in itself is not enough to support an asylum claim from a Chinese practitioner of Falun Gong. That is to say, that individual must show that he or she in that person's individual circumstance is likely to suffer adverse treatment that rises to the level of persecution. So even assuming that this is a protected class, where is the showing from your client of a sufficiently individualized danger to her? Well, I think we have to go back. Do they have a subjective fear of going back? Do they have an objective fear? The objective fear is not whether it's a 10% chance, but whether it's genuine, whether a reasonable person in their situation would have a genuine fear of returning to their country. And I certainly think that's true in this case, Your Honor. In this particular case, did the board reach that issue? The board, I think, was confused. One, they were talking about voluntary associations. They only decided that women couldn't be a social group. It's a demographic. Well, they quoted three cases, including Sanchez Trejillo, which was a situation where it was very easy to opt out of the group. And then they quoted two cases which, to my knowledge, never even mentioned a particular social group. And I mentioned that in my brief. So they didn't really face the issue, and I think they misinterpreted the few cases that they did cite. So what are you asking us to do? I think what we have to do, Your Honor, in all fairness, and I have a recent Ninth Circuit case. It involved suspension of deportation, but the case went on for over five years. And the court decided in order to give the petitioner full due process of law, since so much new evidence had accumulated during that period, and it was not in the administrative record, the only fair thing to do was to remand the case back to the board with instructions to allow the petitioners to submit new evidence on their welfare. So you want us to say that women can constitute a social group for purposes of the statute, for purposes of asylum, and then remand it back for an evidentiary showing of whether or not. As a general proposition, yes. I think if you take that out of Acosta, it says sex, color, and kinship. Well, if sex is a ground for asylum, that's male and female. And that's so certainly I think that, you know, we can accept that. The question is, is this group being targeted for persecution? And we would like the opportunity to submit more evidence because so much has happened in the last five years. Excuse me, Your Honor. The mere fact that the government of Guatemala has enacted a special decree outlawing femicide is an admission on their part that they have a serious problem. And in the case that went before the Inter-American Commission on Human Rights, the Guatemalan government admitted their guilt and said, one, they would like to make a monetary settlement with the mother. Two, they would like to name a street in Guatemala City after the victim. And the mother rejected and said, no, I want the murderer to be brought to justice. And they're not doing that in Guatemala. Okay. All right. Why don't we hear from the government and you'll get another chance to respond. Thank you. Good morning. May it please the Court, my name is Jocelyn Wright. I'm here on behalf of Respondent, United States Attorney General. Let me begin by focusing the Court on what is actually at issue before it. The Board here didn't rule that women can never be a particular social group. What the Board said here was that you have not established that all women in Guatemala is a particular social group as opposed to a broad demographic of the population. That's all the Board did here. So if this Court, even if this Court disagrees with what the Board says, because the Board focused on the particularity component of the test, if this Court disagrees that the Board was wrong and the particularity is not dispositive of whether or not all women in Guatemala can constitute a social group, it doesn't need to, and in fact I don't think it can go so far as to say that all women can constitute a social group. All the Court can and should do at that point is then to remand this case to the Board of Immigration Appeals with instructions to say that particularity is not dispositive of the question. So you have to go ahead and address what other components of the social group test, which has since been developed in our parties. I'm not sure you and I are reading the same order from the BIA. As I read the BIA order, the BIA order says quite specifically that this group, even as recognized by the IJ, which is not all women in Guatemala, but rather a specific age group and coming back from the United States, the Board says that's too broad. At least that's what I read the Board as saying. And that's part of why I think the Board here was pretty narrow. The immigration judge considered the particular social group of 14 and 40, women between 14 and 40. On appeal to the Board, Petitioner expanded the group all of a sudden to all women in Guatemala, and the Board here said we agree with the immigration judge that women between the ages of 14 and 40 does not constitute a particular social group, meaning the subset does not constitute a particular social group, and the Board said that's correct. And then it goes on to say, and this is at AR page 3, it says we find that the immigration judge correctly declined to recognize women between the ages of 14 and 40 who are Guatemalan and live in the United States as a particular social group and that all women in Guatemala is a mere demographic division of the population rather than a particular social group. And what if we disagree with that? What if I were to say, I'm not sure yet whether my colleagues agree with me, but if I were to say, well, if it is true that women in this group are targeted because they are women with murder and rape and mutilation, that is a social group, just as it is a social group that women between a certain age in certain countries are subject to general mutilation. What if I were to conclude that? Do we send it back to the IJ and the BA and say, well, they are a social group, but now the question is, has this particular individual shown that she's at sufficient risk of this treatment? And I would ask the Court to keep in mind that the record in this case would not support such a broad ruling as a recognition that all women in Guatemala does constitute a social group. And the reason I say that is because, as Judge Fletcher pointed out, the key question is, are women being murdered because they're women? Petitioner here is confusing the types of harm that are being inflicted on the women, which is gender-related or gender-specific in the sense that, you know, the types of rape or the type of mutilations may be because or are done because they're women and not because of the motive for the murder. And that's two different inquiries. And so the record in this case doesn't... I missed you. What are the two different inquiries? Well, let's take FGM for an example. FGM has to be against women because it's mutilation of the female genitalia. It's inescapably against women. Exactly. Correct. Rape, however, domestic violence, all of the other things that he says are gender-specific, is not necessarily gender-specific. Rape can happen to men or women, children of any age or any gender. So to say that they are being murdered because they are women because they are being raped, I don't think necessarily follows. Logically, it just doesn't make any sense. And so I think that confuses the issue. But let me back up and make sure I understand your point. But it's possible that someone is being raped because she is a woman. That's completely possible, Your Honor. It's possible that someone is being murdered because she is a woman. That is completely possible. And it's possible that this is happening in Guatemala. It may be possible. It hasn't been established or demonstrated in this record. Now, how do you know that it hasn't been established on the record? Well, if you look at the record, I'm looking at petitioner's own evidence. Administrator record is 79. These are the notes from the Conference of the Human Rights Women's Organizations that met. One of the women there said, The causes of the murder is impossible to say. And that's a quote. That's at AR 79. At page 80 of the administrator record, 80% of all of the murder victims, 80% are women, 92% are men. At AR 81, they list four hypotheses for the reasons why women are being killed. And these include a backlash from the civil war, the long-standing civil war that happened in Guatemala, civil narco-trafficking, apparently that was a very big problem or there was a lot of connection to narco-trafficking where the women are being victims, fundamentalist evangelical teachings that are spreading conservatism in the country, or more media coverage. And at AR 87, one of the women commented, one of the meeting attendees commented that we need to investigate who the victims are, what they did, was the murder explained by personal problems before we can make a conclusion that women are being murdered because they are women. Administrator record 86, they have a criticism of the Berger government's answer to the issue, excuse me, the issue is dealing with the effects and not the causes. And that's exactly what the petitioner is doing here. He's saying the effect is that women are being murdered. But that's not the cause. And that's the reason. But did the board address all of that evidence? Well, but the board here, the board considered the record. And I think it's incumbent on those kinds of factual things, it's up to the petitioner to point out to the board. The board here addressed the board. Well, they said that this wasn't a social group. So why is there any need for them to look at that evidence? Well, but that's the broader, because that answers the question of what constitutes the social group. Are women being murdered because they are women? That is the fundamental question underlying that. So the alleged persecution, in your view, has to be tied to the social group? It has to be motivated. That is, the social group is defined by the alleged persecution. No, that's what petitioner is doing. And we're saying that you can't do that. You can't define social group. What did you just do? I don't understand. I don't understand your argument at all. He's saying that women are being murdered because they are women. Let me ask you this. How do you square what the board did with our current case law on social group? It's consistent with the court's case law. In fact, this court has deferred specifically to the board's jurisprudence on how to analyze and define what constitutes a social group under the law. And that's a matter of SEG. Donchev was the most recent. I believe Soriano as well. They all deferred a matter of SEG and the board's decisions predating that, a matter of AME and JGU, a matter of EAG, all of those cases, a matter of CA, that discuss particularity and social visibility. And that's part of the question that brings me back to the point that I made in the beginning. The board here focused solely on particularity. After it issued the decision in this case, the jurisprudence on social group has developed substantially, not just at the board level but also at the circuit court level. And so even if this court disagrees with the board's decision here in saying particularity is not sufficient ground to say that, in this case, all women of Guatemala is not a particular social group, I don't think the court can go so far as to say, therefore, all women can be a social group, because you need to send it back to the board pursuant to Ventura and Thomas so that it can apply the current jurisprudence that has since developed regarding what constitutes a social group to the documents and the record at issue here and to the issue of whether women can constitute a social group in Guatemala. Let me ask you questions that we asked your fellow counsel in the related group. Do you have any knowledge about how one might go about asking for humanitarian relief from DHS? Yes. How does one do that? And as a subsidiary to that question, does the Attorney General have any power to request that such relief be granted? To answer your first question, the prerequisite to requesting the kind of reprieve from removal that we were discussing, you were discussing earlier with my colleague, the prerequisite to that has to be a final order of removal. There's no point otherwise to requesting a reprieve unless there's an actual final order of removal. So that would assume … And a denial of asylum doesn't qualify? No, it has to be a final executable order of removal. And what we have here is, in both cases, we have denial of asylum with voluntary departure. Right. But I'm saying that even if it would require the court to rule on the petitions first for there to be a final order that the board … I mean, I'm sorry, that the DHS has to say. Okay. If there is a final order coming out of us denying the petitions. Right. And the final order affirms or denies the petitions with the consequence, I'll say it in the non-technical sense, with affirming the board's order of denying asylum and granting voluntary departure. As a technical matter, at that point, is humanitarian relief available? It can be. I see. So the formal term of relief from removal doesn't really quite mean removal as it means in the other sense, because there is no order of removal. It's merely a denial of asylum. That's why I refer to it as a reprieve from removal, a temporary reprieve. I believe the procedure would be for a petitioner's counsel to write a letter to the field office director who is in charge of enforcing the actual removal order. DHS General Counsel, Office of Immigration and Litigation, all our involvement is with the validity of the order itself. Enforcement of the order is within the hands of the enforcement divisions of DHS. And so the field office director is the one who would decide whether or not deferred enforced departure would be something that would be granted in his or her discretion. So that's made at the local level? That's at the local level. As to your second question, does the Attorney General have the authority to recommend a grant of deforced enforcement? I don't believe so. In fact, I think it would be almost inappropriate in the sense that for the Attorney General to step in on an individual basis on a case that's under litigation and especially when the purview, when the decision whether to enforce or not enforce a removal order is solely within the discretion and the purview of the Department of Homeland Security. The attorneys in my office and, of course, DHS General Counsel can make recommendations and they can say these are your options, but I think that's the extent of our role. Okay. That's the limits of what we can do. Okay. That's helpful. If there's any other questions? Thank you. We ask that the petition be denied. Thank you. Well, Your Honor, I agree and disagree with Government Counsel. I agree with her that in order to seek humanitarian relief, you must have a final order of removal before you can do that. I disagree with her on her analysis of the femicides. What she was doing is exactly what the government of Guatemala was saying, that they were just treating these as homicides, murders, that this was domestic violence, that these were women that belonged to gangs or was drug-related or the one that comes up most often is they were dressed inappropriately, they were wearing miniskirts, they were asking for it. The fact we had both houses of Congress enact resolutions urging the Assistant Secretary of State to ask Guatemala to take action to prevent it. What evidence do we have? We're hearing evidence on the other side, but what evidence do we have in the record, in the current record, supporting your argument that femicide is going on, and by femicide I mean murder of women because they are women? Well, I submitted some of this along with my briefs. It was not in the administrative record. You know, if the Court wants to take judicial... No, I'm asking what's in the administrative record now. No, the main thing we put in back in 1905, when this was just being recognized as a problem, the thing that most impressed the IJ, Judge Gasly, and I spent a great deal of time before him, was an article in National Geographic that just described the condition in Guatemala as absolutely appalling, and that's why he made that remark. I think that's why we need to remand this case. It's been going on for a number of years. The situation of femicides has grown worse during this period, and I believe as a matter of due process, the petitioners should have the opportunity to add new evidence to the administrative record in immigration court as to what's going on now. And I keep going back to April 9, 2008. The Guatemalan Congress passed Decree 22-2008, the law against femicide and other forms of violence against women. So they officially recognized that the femicide is going on. Thank you very much for your argument. I would just say in closing, if the Court wants to make a recommendation that this is a case worthy of humanitarian relief, I would welcome it, but I do think we should have the opportunity... Well, we're just noting what the IJ said. Excuse me? We were just... Judge Fletcher was just noting what the IJ said at the hearing in... Well, at that point, the attorney has to decide, am I going to accept the final order of removal and appeal basically to ICE, which I think is a very well-named organization. They're not particularly keen on humanitarian support, or take an appeal on the merits. So we took an appeal on the merits. If the worst comes to worst, we will certainly seek humanitarian relief. But I think the case does demand to be remanded here. Okay. Okay, thank you very much. The case of now Leslie Perdomo v. Holder is submitted for decision.
judges: Nelson D. W., Fletcher W. , Paez